UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) Crim. No. 05-51-B-W |
| | ) |
| DAVID B. KINGSBURY, | ) |
| | ) |
| Defendant | ) |

**RECOMMENDED DECISION
ON MOTION TO SUPPRESS**

This matter is before the court on David Kingsbury's motion to suppress evidence seized from his residence in Unity, Maine. (Docket No. 14.) The *sole* basis of this motion is that April Robert, a citizen from Unity, Maine, acted as an agent of law enforcement officers when she viewed information on David Kingsbury's computer on the night of October 25, 2004. I now recommend that the court adopt the following proposed findings of fact and determine that there is *no* evidence that April Robert acted at the behest of any law enforcement officer on October 25 or at any other time. Accordingly, the motion to suppress must be **DENIED** because the Fourth Amendment has no applicability to searches undertaken by private individuals.

**Proposed Findings of Fact**

On October 25, 2004, April Robert called the communications center for Waldo County. Ms. Robert called to report that Kingsbury had set up Yahoo! profiles using her name without her permission. She informed the dispatcher that she was at the defendant's apartment and that he was deleting files from his computer. At approximately 11:30 p.m. a Waldo County dispatcher assigned the call to Maine State Police Trooper Jason Richards. He arrived at 25

Main Street in Unity a short time later and met with Ms. Robert. Following that conversation evidence was seized from Kingsbury's apartment and computer.[1]

Ms. Robert told Trooper Richards that David Kingsbury had been establishing profiles in Yahoo! pretending to be Robert and posting her personal information on the Internet. On the evening of October 25, she had gone to his apartment to confront him pursuant to a "sting" operation she had devised with the assistance of her current boyfriend, Dwayne Smart. Robert suspected that either Kingsbury or Mark Picard was the individual who had been using her personal information on Yahoo! chats during the fall of 2004. Ms. Robert described Kingsbury as a "friend" she had met while working at the local laundermat. Mr. Picard was Robert's ex-husband. In order to ascertain whether either man had been using her Yahoo! identity Robert visited each man's residence while her boyfriend, Smart, engaged in an Internet instant message (IM) chat with the person assuming her identity. Robert went to Mr. Picard's residence first, all the while communicating by cell phone with Smart, who remained at Robert's apartment manning the computer. When Picard came to the door, Smart told Robert via the cell that the imposter was still "chatting" with him over the Internet. Reasoning that Picard could not be both at the door speaking to her and also typing away at the keyboard, Robert eliminated Picard from her list of suspects and departed for the Kingsbury residence.

At some point during the ongoing chat session between Smart and the imposter, the imposter told Smart that he was sitting at the computer in the dark, thereby explaining his clumsy keystrokes. Lo and behold, when Robert arrived at the Kingsbury apartment the lights were out and it was dark inside. Robert knocked on the door. Smart immediately advised her via the cell

---

[1] It is unclear to me whether the computer was seized pursuant to a warrant or pursuant to some recognized exception to the warrant requirement. No testimony was offered on that issue and the motion papers do not discuss how the police came to seize the computer.

that the imposter had stopped instant messaging him.  It appeared to Robert that the culprit was identified.

   According to Robert, Kingsbury's "mouth hit the floor" when he saw her standing at his door.  Robert confronted Kingsbury with her suspicions and demanded access to his computer to determine whether her suspicions were correct.  After some hesitation, Kingsbury allowed Robert to run a search on his computer to determine whether it contained a certain picture she was concerned about.  As Robert approached the computer she saw a printout of e-mail messages on the printer and those messages contained her various screen names.  She seized the paper and proceeded to the computer.  Robert was aware of one particular JPEG file that included a picture of Smart, her new boyfriend and fellow, amateur sting operative.  Robert intended to check Kingsbury's computer to see if that picture was there because she believed that its presence on Kingsbury's computer would provide the "proof" she needed against him.  Robert apparently performed some manner of file search of the hard drive in Kingsbury's computer.  She testified that she mistakenly typed in a broader search parameter than she intended.  I assume that she designated "*.jpg" or something similar as a search parameter, which would ask the computer to locate all of the picture files resident on Kingsbury's drive that were stored in JPEG format.  When Robert hit the enter key, a series of images began to appear on the computer monitor screen, including several adult pornographic pictures.  Kingsbury then tried to remove Robert from the computer.  Robert thereupon called the 911 operator from her cell phone and made a complaint to a dispatcher for Waldo County.  Robert observed Kingsbury deleting items from his computer and she relayed that observation to the dispatcher.

   In the truth-is-stranger-than-fiction category, Robert's cell phone battery expired in the midst of the call.  She then obtained Kingsbury's permission to use his land line and completed

3

her 911 report to the Waldo County dispatcher from Kingsbury's own phone. The Waldo County dispatcher contacted the Maine State Police and arranged for the trooper who routinely patrols that area to go immediately to Kingsbury's apartment to meet with Robert, who reported that she would be waiting outside in the parking lot.

According to the testimony of Detective Jason Richards (then Trooper Richards), which I credit, he never communicated with Ms. Robert before he responded to her complaint on the evening of October 25, 2004. He was, however, aware that Detective Scott Bryant of the Maine State Police was investigating an August 10, 2004, report by a law enforcement agency in North Carolina that the defendant had disseminated child pornography using the Internet. Detective Bryant had been assigned that case on October 7, 2004, when Tom Bureau of the Internet crimes task force alerted him to the North Carolina complaint regarding Kingsbury. No evidence was presented that in any way suggests April Robert had anything to do with the North Carolina complaint. Bryant took the information "under advisement" but did not take any affirmative steps in the investigation other than to tell Trooper Richards of the case on October 8. Bryant learned that Richards did not know Kingsbury and apparently had nothing to contribute to the investigation. The next contact he had with Richards concerning Kingsbury occurred following the receipt of Robert's October 25, 2004, complaint regarding Kingsbury.

As of October 25, 2004, Detective Scott Bryant was aware that the defendant likely lived in the Unity area and he conveyed that information to Richards. He had not had any contact with Kingsbury and he had not had any contact with Ms. Robert or with anyone else on her behalf. He knew that the Yahoo! website where Kingsbury allegedly posted and viewed child pornography images had been shut down by Yahoo!. It is fair to infer that this investigation was

4

not the most pressing case on Bryant's plate since the evidence established that his primary duties relate to homicide investigation.

Robert provided additional details concerning her relationship with Kingsbury and the type of Internet harassment she had endured at his hands. For someone unschooled in the charms of Internet profiling and instant messaging the story was a little difficult to follow, but I gather that Robert had struck up an acquaintanceship with Kingsbury through a girlfriend with whom she worked at the laundermat in Unity. Initially Kingsbury came in on Saturdays when the girlfriend worked but at some point he changed his habit to come in on Sundays when Robert worked. Before the night of October 25 Robert had only been to Kingsbury's apartment once before and that trip was in connection with the delivery of a couch that her brother was giving away and which would apparently improve the décor at chez Kingsbury. Reading between the lines, Robert's belief apparently was that Kingsbury hoped their "acquaintanceship" might develop into a more substantial relationship.

Robert had become a fan of Yahoo! instant messaging during the last couple of years. She purchased a computer because her daughter was a high school student who used the computer for school work. Robert herself became proficient and apparently enjoyed instant messaging, including chats with Kingsbury. At some point, however, she and Kingsbury's "acquaintanceship" chilled, ostensibly because Kingsbury looked at Robert's daughter in an inappropriate manner one day in the laundermat, but the chill also arose at about the same time Robert began her friendship with Smart. According to Robert's testimony, I infer that she believes that Kingsbury's motive for posing as her on the Internet was because she wanted them to be "friends" and he wanted more of a relationship. It also appears that Robert thinks that

5

Kingsbury was up to no good vis-à-vis her daughter and that her rebuke of him regarding the ogling at the laundermat created hard feelings on his part.

In any event, as the Kingsbury/Robert "acquaintanceship" deteriorated, the harassment on the Internet increased. One morning at about 2:30 a.m., a man who identified himself as "Tim" called Robert at her home number and indicated he and his wife wanted to know when she was coming over to his house for the *ménage à trois* promised during a recent IM chat. He had information about her phone number, where she lived, and her username from the Internet, indicating that he had just been chatting with her. Robert asked Tim what user name he had been receiving messages from and sending messages to. Tim told her the name and, armed with this knowledge, Robert and Smart devised their "sting operation." Understandably, Robert was quite upset about the type of private information that had been placed on the Internet. Robert did not, however, call the police. Apparently she believed that she needed some definitive proof before she accused Kingsbury of misusing her Yahoo! account and ID, which she obtained on the evening of October 25. Robert testified that it was very significant to her that the user name that the imposter was using on the night of October 25 was the same user name with whom Tim had been chatting. In Robert's mind this similarity provided her with conclusive proof that it was Kingsbury who had been posing as her on the Internet.

## Discussion

The Fourth Amendment "is wholly inapplicable to a search or seizure, even an unreasonable one, effected by a private individual not acting as an agent of the Government or with the participation or knowledge of any governmental official." United States v. Jacobsen, 466 U.S. 109, 113 (1984) (internal quotation and citation omitted). The First Circuit has identified a number of factors to consider in determining whether a private person has acted as an

6

agent of the government depending upon the circumstances of the individual case.  Those factors include: "the extent of the government's role in instigating or participating in the search, its intent and the degree of control it exercises over the search and the private party, and the extent to which the private party aims to help the government or to serve its own interests."  <u>United States v. Pervaz</u>, 118 F.3d 1, 6 (1st Cir. 1997).

I heard testimony from three credible witnesses, Detective Bryant, Trooper Richards, and April Robert, all to the same effect:  the government had <u>no</u> role in instigating or participating in the search.  Nor is there any reason to hypothesize that April Robert was spurred to action because of some unknown Internet detective dropping her suggestions during a chat.  Robert was emphatic that she had no contact with law enforcement prior to the night of October 25, 2004.

I believe it is equally clear that the government exercised no control over either the manner in which the search was conducted or the conduct of April Robert.  It defies both logic and common sense to postulate that a reputable law enforcement agency such as the Maine State Police would send an unmonitored female confidential informant into a darkened apartment building to confront a suspected pornographer about his activities.

It is equally clear that Robert was motivated by her own indignation and not because she sought to assist the government in its investigation of child pornography on the Internet.  Robert confronted Kingsbury because of her outrage over his use of her personal identity on the Internet.  It had nothing to do with the government at all.

## Conclusion

Based upon the foregoing I recommend that the court **DENY** the motion to suppress.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to

28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated:  October 12, 2005